# BROWN, ET AL. *v.* BOWLES

[No. 294, September Term, 1968.]

*Decided June 30, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, MCWILLIAMS, FINAN and SINGLEY, JJ.

*David M. Williams,* with whom was *Walter B. Dorsey* on the brief, for appellants.

*W. Tayloe Murphy, Jr.,* with whom was *Oliver R. Guyther* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

From St. Mary's County comes this dispute as to who may haul seine along the south shore of Heron Island. Its disposition requires of us further consideration of the Potomac River Compacts of 1785 and 1958. Since the focus of our investigation will be rather narrow, we shall not undertake a review of the history of the Compacts. That has been dealt with by Judge Hammond (now Chief Judge) in *Dutton v. Tawes*, 225 Md. 484 (1961), and by Chief Judge Marbury in *Barnes v. State*, 186 Md. 287 (1946). The only facts before us are those stated in the bill of complaint, the demurrer to which was sustained without leave to amend.

On 1 August 1968 the appellants (Brown) filed a bill for an injunction in the Circuit Court for St. Mary's County against the appellee (Bowles), the allegations of which, somewhat abridged and paraphrased, are as follows:

> Brown is the owner in fee simple of a tract of land known as "Heron Island," conveyed to him on 26 June 1944 by the State of Maryland by patent, and more particularly described as follows:
>
> Beginning for the same at an iron pipe set in the ground at the high water mark (said pipe being North 75° 47′ East of the Blackistone Island Light House) and set on the extreme southwest point of the said Heron Island, thence following the high water mark eleven courses and distances: containing three-tenths (0.3) of an acre.
>
> Heretofore, on numerous occasions Bowles has fished to the south of the line, that runs from Huggins Point to Blackistone (St. Clements) Island nearer than 100 yards opposite the shore of Heron Island without permission and without consent and against the will of Brown, for the extensive purpose of fishing by haul seine.

Said entry by Bowles violates the general laws of Maryland, that being Article 66C, Section 253, of the Annotated Code of Maryland (1957). Brown has repeatedly requested and advised Bowles to not stay within the prohibited limits of the shore and not to trespass thereon or to fish in the waters appurtenant thereto and that Brown uses said waters for his own seine. On several such occasions, Bowles has been rude and insulting to Brown, cursing and abusing him and using language tending to violate and breach the peace. And on several occasions, Bowles stated to Brown that he could not stop him and that he intended to fish in said waters in violation of the above mentioned statute.

The fishing in the prohibited waters by Bowles constitutes a trespass upon said land, damaging Brown's right of privacy and ownership, interfering with his right to fish unmolested in his own waters and impairing his use and enjoyment of his lands and waters. The repetition with which Bowles has committed such trespassing and his avowed intention to continue to do so not being adequately compensated in damages creates such a condition that Brown has no plain, adequate and complete remedy at law, and so must resort to a Court of Equity for injunctive relief to restrain and enjoin Bowles from trespassing on his lands and waters against his will and without his consent or permission, and openly, hostilely and defiantly insulting Brown so as to tend to cause violence and breach of peace.

Brown's prayer for relief sought to have Bowles permanently enjoined from fishing in "said waters" and from interfering with his riparian rights.

Heron Island is a little over one nautical mile south of the entrance to St. Clements Bay. It appears to be un-

inhabited. Doubtless there are times when all or most of it is under water. It was conceded at argument in this Court that it lies within the jurisdictional boundaries of the Potomac River Fisheries Commission. Code, Art. 66C, § 216A (1967 Repl. Vol.).

The statute upon which Brown relies was enacted in its present form in 1929. Laws of Maryland of 1929, Ch. 471. Minor amendments have left it substantially unchanged. It is now codified, Art. 66C, § 253 (1967 Repl. Vol.), and in relevant part it is as follows:

"§ 253. Riparian rights in certain counties.

"The owner of any land bordering on any tidal waters of the tributaries of the Chesapeake Bay, except the waters of the Great Choptank River, lying in the State of Maryland, or anyone who is a tenant, renter or lessee of such owner, shall by virtue of such ownership or occupancy be first entitled to make a choice of the set or position to place nets or establish a haul seine fishery in front of the property of which he or she is the owner, tenant, renter or lessee of the riparian rights therein, for the purpose of catching fish for commercial use; provided that if such owner, tenant, renter or lessee of said riparian rights do not avail themselves of the privilege of locating the position where they desire to set their nets or haul seine each year within twenty days after receiving notice hereinafter provided from any other person who may desire to locate their nets or fishery in front of said riparian owner's property, then it shall be lawful for such person to locate or place their net or haul [their] seine in front of said property; * * * nor shall anything herein contained be construed to grant any rights to fishermen by reason of such notice to fish upon any of the waters, nearer than 500 yards opposite any shore used as a pleasure resort so as to interfere

with bathing or boating on such shore, without permission of the shore owner. The notice provided for above shall be mailed to the owner of the shore, or to the tenant, renter or lessee of such shore property. If the name and address are unknown, then such notice shall be posted for twenty days on a board fastened to stake driven in the water directly in front of the property and at a distance not greater than 100 yards from shore. Nothing in this section shall be construed to permit any riparian owner or anyone acquiring the rights of a riparian owner to fish with nets or seine in any manner or at any time prohibited in this subtitle. * * *."

Article Eighth of the Compact of 1785 provides that "all laws and regulations which may be necessary for the preservation of fish, * * * shall be made with the mutual consent and approbation of both states." Brown concedes that, since § 253 was enacted unilaterally and that it never has received the "consent and approbation" of Virginia, it was not, at any time, in effect in the Potomac River prior to 1957 when the Maryland Legislature attempted the unilateral abrogation of the Compact. Laws of Maryland of 1957, Ch. 766. First off, therefore, we are presented with the question whether Maryland's attempt at unilateral abrogation was effective. Brown argues that the Act of 1957 did nullify the Compact of 1785 and that, as a result, § 253 thereupon became "in effect" on the Potomac River, since the "consent and approbation" of Virginia was no longer essential. Section 2 of Article VII of the Compact of 1958 (Code, Art. 66C, § 261A) is as follows:

*Section 2. Existing laws.* The laws of the State of Maryland relating to finfish, crabs, oysters, and clams in the Potomac River, as set forth in Article 66C of the Annotated Code of Maryland *and as in effect on December 1, 1958,* shall be and *remain applicable* in the Potomac

River except to the extent changed, amended, or modified by regulations of the Commission adopted in accordance with this compact." (Emphasis added.)

It appears to be conceded that the Potomac River Fisheries Commission has not adopted any regulation which could be said to change, amend or modify the provisions of § 253. Brown concludes, therefore, that § 253 is in effect on the Potomac and that he is entitled to its benefits. That § 253 is and has been in effect on waters outside of the jurisdictional boundaries of the Commission is not in dispute.

The Federal Constitution requires the consent of Congress to any agreement or compact between the states. Art. 1, § 10. Although the Compact of 1785 antedated the Constitution by some four years the question whether congressional consent is essential to its validity is no longer relevant since there seems to be no doubt that implied, if not actual, consent has since been given by Congress. *See Wharton v. Wise,* 153 U.S. 155 (1894). The cases involving unilateral abrogation are few and they seem not to provide any support for it. In *Virginia v. Tennessee,* 148 U.S. 503 (1893), Virginia sought to abrogate a boundary agreement made with Tennessee in 1803 on the ground that Congress had never given its specific consent. The Supreme Court found implied consent and held that it was sufficient. In *West Virginia ex rel. Dyer v. Sims,* 341 U.S. 22, 28 (1951), Mr. Justice Frankfurter delivered the opinion of the Court. He said:

"* * * [A] Compact is after all a legal document. * * * It requires no elaborate argument to reject the suggestion that an agreement solemnly entered into between States by those who alone have political authority to speak for a State can be unilaterally nullified, or given final meaning by an organ of one of the contracting States. A State cannot be its own ultimate judge in a controversy with a sister State."

*See also Chesapeake & Ohio Canal Co. v. B. & O. R. R.,*
4 G. & J. 1, 108, 131, 146 (1832); C. Everstine, *The
Compact of 1785,* Research Report No. 26, Legislative
Council of Maryland (1946).

Brown assumes the validity of the abrogation and
points out, correctly to be sure, that no court has ever de-
clared it, Ch. 766 of the Laws of 1957, to be invalid. Vir-
ginia, it will be recalled, soon after the attempted abroga-
tion, filed suit against Maryland in the Supreme Court.
*Virginia v. Maryland,* 355 U.S. 269 (1957). This led to
the appointment of the Potomac River Commission, con-
sisting of representatives from both Virginia and Mary-
land. *See Virginia v. Maryland,* 355 U.S. 946 (1958).
Out of their deliberations came the Compact of 1958
which, with several amendments, was adopted by both
states and consented to by Congress. Article IX of the
Compact of 1958 is as follows:

> "This compact, which takes the place of the
> Compact of 1785, between Maryland and Vir-
> ginia, shall take effect at the expiration of 60
> days after the completion of the last act legally
> necessary to make it operative, and thereupon
> the said Compact of 1785 shall no longer have
> any force and effect."

The Compact took effect 60 days after 8 November 1960.

There is no need for us to speculate on what conclu-
sions the Supreme Court, or this Court, might have
reached in respect of the validity of the abrogation. Ar-
ticle IX of the new Compact puts it in "the place of the
Compact of 1785" and declares, in effect, that the force
and effect of the Compact of 1785 shall continue until the
new compact "shall take effect." By the enactment of
Ch. 269 of the Laws of 1959, "an act to approve, confirm
and ratify" the Compact of 1958, the Legislature recog-
nized the continued existence of the Compact of 1785
and, in effect, the futility of the attempted abrogation.
*Cf. Bell v. State,* 236 Md. 356, 363-67 (1965). In the gen-
eral election held 8 November 1960 the citizens approved

the action of the Legislature; 244,510 voted for the Compact, 204,837 voted against it. In short, both the Legislature and the citizens have made that decision. We have but to announce it. We hold, therefore, as we must, that the Compact of 1785 was in full force and effect from 1785 until 7 January 1961 when it ceased to "have any force and effect." It follows necessarily, in light of Brown's concessum, that § 253 was not "in effect on December 1, 1958 * * * in the Potomac River."

We shall not labor the point, since what we have said is dispositive of the case, but we think one might argue with some effect that § 253 was never intended to apply to that area of the Potomac within the jurisdictional boundary of the Compact. Sec. 253 first appeared as a part of "An Act to repeal Article 39 of the Code of Public General Laws of Maryland, title 'Fish and Fisheries' * * * and to enact in lieu thereof a new Article." Ch. 471 of the Acts of 1929, *supra*. As stated in the title the purpose of the statute was "to embody all the fish laws of the State of Maryland, both public general and local; and continuing in effect Sections 61 to 67 inclusive, * * * under this sub-title 'Concurrent Law on the Potomac River' which sections embody the concurrent legislation between the States of Maryland and Virginia on the Potomac River." Sec. 253 (then § 22) appears, under the heading "Riparian Rights," in Part I of the new Art. 39, the provisions of which deal, except for one other section requiring owners of dams to provide "Fish Ladders," with administration, procedure, arrests and penalties. The 1929 statute goes on to regulate, in elaborate detail, fish and fishing in the waters of Anne Arundel, Baltimore, Caroline, Cecil, Charles, Queen Anne's, St. Mary's, Somerset, Talbot and Wicomico counties, and there are separate regulations for the Chesapeake Bay, the Head of the Bay, the Patuxent River, the Severn River and the Choptank River. Other than in the "Concurrent Laws" the Potomac River is mentioned only incidentally; e.g., the shad and herring season in the Potomac River was declared to be from 1 March to 31 May.

The sections of Art. 39 mentioned above, although since transferred to Art. 66C, have remained, as we have said, substantially undisturbed.

During argument counsel remarked that Bowles has a haul seine license issued to him by the Potomac River Fisheries Commission and that the Commission has adopted and promulgated regulations relating to fishing by haul seine. If Brown's contentions were to be upheld the Commission regulations would be quite limited in scope and its licenses to fish by haul seine would be of little value for the obvious reason that the waters in front of the bars, shoals and flats, within the jurisdictional boundaries, where fishing by haul seine is feasible, would be preempted by the riparian owners. The waters of the Potomac are not "Brown's waters;" the rights to fish in them "shall be common to and equally enjoyed by the citizens [not just the riparian owners] of Virginia and Maryland." Compact of 1958, Art. III, § 4 (a).

We shall affirm the order of the trial court sustaining, without leave to amend, the demurrer to the bill of complaint.

*Order affirmed.*
*Costs to be paid by appellants.*