**CALIFORNIA TAHOE REGIONAL PLANNING AGENCY et al., Plaintiffs,**

**v.**

**SAHARA TAHOE CORPORATION et al., (2 cases), Defendants.**

**Nos. CIV-R-79-9-ECR, CIV-R-79-156-ECR.**

United States District Court, D. Nevada.

Oct. 29, 1980.
As Amended Feb. 20, 1981.

Joel Moskowitz, Asst. Atty. Gen., San Francisco, Cal., for CTRPA and State of California.

Joseph C. Easley, Bruce A. Behrens, Sacramento, Cal., for Calif. Dept. of Transportation.

John Frankovich, Reno, Nev., for Sahara Tahoe Corp.

Gary A. Owen, Zephyr Cove, Nev., for TRPA, Cooke, Kjer, Bensinger, Stoess, Meder, Henry, Woods, Singer, Stewart and Steele.

Michael Smiley Rowe, Dist. Atty., Minden, Nev., for Douglas County.

## MEMORANDUM DECISION

EDWARD C. REED, Jr., District Judge.

These cases involve the proposed construction of a six-level parking garage by defendant, Sahara Tahoe Corp. (Sahara), on the south shore of Lake Tahoe in Nevada. Plaintiffs, the State of California and the California Tahoe Regional Planning Agency, (Cal-TRPA), seek to enjoin the proposed construction.

The actions were consolidated for further proceedings by order of this Court on June 20, 1980. The parties are presently before the Court on a motion for summary judgment, or alternatively judgment on the pleadings, filed on behalf of plaintiffs and a motion to dismiss filed on behalf of Sahara. Sahara's motion to dismiss is being treated as a motion for summary judgment pursuant to Rule 12(b) and Rule 56 F.R.C.P.

Jurisdiction of the Court is based on federal questions, 28 U.S.C. § 1331(a), and the Court's pendent jurisdiction. Resolution of the case is substantially dependent upon the interpretation of 42 U.S.C. § 7410 (a)(5)(A)(iii) and 42 U.S.C. § 7604(a) of the Clean Air Act. In addition, because plaintiffs allege that the actions of defendants Tahoe Regional Planning Agency (TRPA) and Douglas County (County) pursuant to the TRPA Land Use Ordinance will substantially affect the effective functioning of the Tahoe Regional Planning

Compact (Compact), the Court has independent federal question jurisdiction to review such actions. *League to Save Lake Tahoe v. B.J.K. Corporation,* 547 F.2d 1072 (1976).

## FACTUAL AND PROCEDURAL BACKGROUND

The present litigation finds its origins in a more basic controversy between the states of Nevada and California. The two have previously been at odds with each other over the extent to which future development is to be permitted in the Lake Tahoe basin.

In the hopes of compromising their divergent views, the states entered into an interstate compact, the Tahoe Regional Planning Compact, creating TRPA.[1] NRS 277.190, et seq., and Calif. Gov. Code § 66800, et seq. TRPA was given the power to "adopt and enforce a regional plan of resource conservation and orderly development." With voting members from both states on TRPA's governing board,[2] it was hoped that the interests and goals of both states could be protected and achieved. Unfortunately, since development is continuing in the Tahoe basin at a rate apparently more rapid that California interests desire, California has not been pleased with the results.

The controversy before the Court involves one of several cases in which California is attempting to halt development in the

basin by the Nevada gaming industry. On September 22, 1978, defendant Sahara filed an application with defendant Douglas County (County) for a special use permit for the construction of a six-level parking garage to accommodate 2,100 vehicles. Following public hearings on October 5, 1978, the County approved the project without modification. The application was subsequently placed on TRPA's agenda and formal approval by a dual majority (a majority of the voting members of each state) was given on December 20, 1978.[3] The approval was made subject to the condition or modification that Sahara remove 458 existing surface parking spaces from the site, and replant the area with vegetation chosen to conform with the natural vegetation of the area.

Shortly after this approval, on January 15, 1979, the State of California and the California Tahoe Regional Planning Agency (Cal-TRPA), filed their first suit to enjoin the Sahara project. *Cal-TRPA v. Sahara Tahoe Inc., et al.,* CIV–R–79–9–ECR (D.Nev., filed Jan. 15, 1979). The plaintiffs alleged that neither the County nor TRPA considered whether the proposed project was in compliance with TRPA ordinance No. 78–5;[4] that the County and TRPA failed to make findings required of them by Section 8.33 of TRPA's Land Use Ordinance;[5] that TRPA was required to comply

---

1. The Compact has the stated goals of insuring resource conservation, orderly development, and the protection of the environment of the Lake Tahoe basin. TRPA, the interstate agency created by the Compact, was directed to adopt and enforce a regional plan to achieve the Compact's goals. The agency was authorized to adopt "all necessary ordinances, rules, regulations and policies to effectuate the adopted regional and interim plans." (Article VI(a) TRP Compact). Further, the cities and counties within the basin and the respective states were mandated to enforce all such ordinances, rules and regulations as adopted by TRPA. (Article VI(b)).

2. TRPA's governing board originally consisted of five members from each state. Of the five members, three represented local interests, one was appointed by the Governor of the state and one was the administrator or director of the state agency dealing with natural resources.

3. Article III(g) of the Compact states, "A majority vote of the members present representing each state shall be required to take action with respect to any matter . . . ." The Ninth Circuit Court of Appeals in *People of St. of Cal. Ex. Rel. Younger v. Tahoe Reg. P. Ag.,* 516 F.2d 215 (9th Cir. 1975), held this to mean that a majority vote by each state's delegation is required to take any action.

4. TRPA Ordinance 78–5 placed a temporary moratorium on the construction of all projects that would result in the creation of more than one hundred five (105) vehicle trips per day per acre of land included within a proposed development from the proposed use. The ordinance expired on January 1, 1979.

5. Section 8.33 of the TRPA Land Use Ordinance states in pertinent part: "Administrative permits may be . . . granted only if it is found by the permit-issuing authority that the estab-

with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq., and failed to do so;[6] that TRPA was required to comply with the provisions of the California Environmental Quality Act (CEQA), Calif. Pub. Resources Code § 21000, et seq., and failed to do so;[7] that the proposed project would constitute an interstate nuisance; and finally that Sahara's project constituted a complex source of air pollution within the meaning of the federally approved Nevada State Implementation Plan (40 C.F.R. 52.1470 et seq.), thus requiring Sahara to apply for and obtain an Air Registration Certificate (ARC).[8]

Sahara responded on March 19, 1979, with a motion to dismiss for lack of subject matter jurisdiction, Rule 12(b)(1) F.R.Civ.P., and failure to state a claim for which relief can be granted, Rule 12(b)(6) F.R.Civ.P.

In turn, plaintiffs filed an amended complaint with four additional causes of action: a claim that members of the TRPA accepted income from the defendant Sahara and subsequently voted on Sahara's project in violation of California's Political Reform Act of 1974;[9] a claim that by virtue of receipt of said income plaintiffs were deprived of a fair hearing in violation of plaintiffs' due process rights; a request that Douglas Costle (Costle) as Administrator of the Environmental Protection Agency (EPA), be compelled to maintain the provisions of Nevada's Complex Source Regulations in its SIP until such time as the Implementation Plan, absent such regulations, meets Federal ambient air quality standards; and finally a cause of action seeking declaratory relief with respect to the rights and duties of the parties in this regard.[10] Sahara has also moved to dismiss the amended complaint.

Meanwhile on another front, Sahara attempted to recoup reverses suffered at the December 20, 1978, hearing of the TRPA. On February 26, 1979, the defendant filed a new application for an administrative permit with Douglas County to construct a

---

lishment, maintenance, or operation of the use ... in the particular case is not (1) detrimental to health, safety, peace, morals, comfort and general welfare of persons residing or working in the neighborhood of such proposed use; (2) or detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the Region, (3) and will not cause any substantial harmful environmental consequences on the land of the application or on other lands or waters." [numbering added.]

**6.** Specifically plaintiffs allege that TRPA is in violation of Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1976). Section 102(2)(C) requires "all *agencies of the federal government*" to "include in every recommendation or report on proposals for legislation and other major *Federal actions* significantly affecting the quality of the human environment", a detailed statement of any environmental effects and *alternatives to the proposed project.*

**7.** CEQA, Cal.Pub.Res. Code §§ 21000–21176 (West 1977) is a California State act which is parallel to NEPA in goals and strategies. Pursuant to § 21082 all "public agencies" must adopt guidelines and procedures for the evaluation of discretionary (as opposed to ministerial or emergency) projects. Pursuant to § 21151 all "local agencies" must prepare and certify the completion of an EIR on any project it proposes to carry out or approve. § 21062 defines "local agency" as any public agency other than a state agency.

**8.** Pursuant to the Clean Air Act Amendments of 1970, § 110(a)(1), 42 U.S.C. § 7410(a)(1), Nevada was required to submit a "State Implementation Plan" (SIP) for the maintenance of minimum air quality standards. Part of Nevada's plan included Nevada Air Quality Regulation 3.22, which requires that an "Air Registration Certificate" be obtained prior to the construction of any "complex" or indirect source of pollution (a "complex" source of pollution is one which while not an emitter of pollutants itself, attracts emitting sources of pollution). The registration certificate would certify that the construction of the source would not impede the obtaining of minimum air quality standards.

**9.** The California Political Reform Act of 1974, Cal.Gov. Code § 81000, et seq., prohibits any public official "at any level of state or local government" from participating in a governmental decision in which he has a financial interest. Cal.Gov.Code § 87100. § 91003 of the Act gives the Court authority to "restrain the execution of any official action in relation to which such a violation occurred."

**10.** Claims Seven and Eight of Suit No. 79–9 deal only with Douglas Costle as Administrator of the Environmental Protection Agency. Mr. Costle was dismissed from the suit by order of this Court dated June 30, 1980.

parking garage, an application identical to the one the County previously approved and that TRPA subsequently approved and modified. Douglas County again approved the application as made and again forwarded it to the TRPA for review. At the June 27, 1979, meeting of the TRPA board, TRPA, viewing Sahara's second application as identical to its predecessor, treated the application as a request to reconsider and denied reconsideration. In denying reconsideration, a dual majority specifically found that the action it had taken December 20, 1978, was TRPA's final action on the project.

Following this action on Sahara's second application, Cal-TRPA initiated another lawsuit against Sahara (CIV–R–79–156–ECR) in which Douglas Costle was named as a defendant along with Douglas County.[11]

Most recently, on January 3, 1980, California filed a motion for judgment on the pleadings or in the alternative for summary judgment in 79–9 and 79–156. The motion was based on a recent decision in the Second Circuit, *Manchester Environmental Coalition v. Environmental Protection Agency*, 612 F.2d 56 (2nd Cir. 1979). In that case it was held that any revision of a state implementation plan (SIP) must comply with substantive as well as procedural requirements of the Clean Air Act.[12]

We now proceed with the resolution of the issues before the Court.

## THE ISSUE RELATING TO ORDINANCE NO. 78-5

The First and Third Claims for relief in plaintiffs' amended complaint in 79–9 and the Second Claim in 79–156 involve TRPA Ordinance No. 78-5. In the First Claim in 79–9 and the Second Claim in 79–156, plaintiffs allege that Douglas County gave its approval to the Sahara project without considering 78–5 as required under Article VI(b) of the Compact.[13] The Third Claim in 79–9 asserts that when the permit application was subsequently forwarded to TRPA, that agency also failed to hold hearings and make findings as required by 78–5. All defendants contend that Sahara's parking garage is exempt from Ordinance 78–5.

The Clean Air Act, 42 U.S.C. § 7410(a)(2)(I) requires states to adopt so-called nonattainment plans for the achievement of the national ambient air quality standard in their nonattainment areas as a precondition to the construction or modification of any major stationary source of pollution. (Nonattainment areas are those areas within a state which do not meet the minimum national ambient air quality standards set by the EPA.) Both the State of California and the State of Nevada designated those parts of the Tahoe basin within their respective states nonattainment areas. Pursuant to such designation, Governor O'Callaghan, then Governor of Nevada, named TRPA as the agency to prepare the required nonattainment plan for the portion of the Tahoe basin lying within the State of Nevada. Governor O'Callaghan requested that TRPA defer certain traffic inducing projects from consideration for approval, pending completion of the plan. In response to his request, TRPA adopted Ordinance No. 78–5 on March 23, 1978. The

---

11. Claims Six and Seven of Suit No. 79–156 refer to Douglas Costle; he was also dismissed from 79–156 by the June 30, 1980, order.

12. Prior to *Manchester*, it was the EPA's policy to require only that a state meet the procedural requirements of the Clean Air Act if it wished to delete its Complex or Indirect Source Review regulations (the state of Nevada uses the term "Complex source" when referring to what the federal government calls "Indirect source") from its SIP. Procedural requirements include proper notice, public hearings and the like. The Court in *Manchester*, however, held that

an amended SIP must also meet the substantive requirements of the Act. That is, the new amended SIP must still be as effective in meeting the minimum air quality standards as its predecessor.

13. TRPA Ordinance 78–5 required the permit issuing authority (Douglas County) and TRPA to make findings that the proposed parking structure would not create more than one hundred five (105) vehicle trips per day per acre of land included within a proposed development, before such a project could be approved.

ordinance placed a temporary moratorium on the construction of all projects that would result in the creation of more than 105 additional vehicle trips per day per acre of land within any particular development. Exempt from 78–5 were all applications received by the counties in the basin or TRPA before 5:00 p. m., March 22, 1978.

Defendants contend that Sahara's parking garage project was grandfathered in under this exemption. It is uncontroverted that Sahara did have a permit application and a zone change request for a parking garage complex pending before TRPA on March 22, 1978. The proposed project, which is the center of the present controversy, differed in some respects from that pending in 1978. It is that difference which apparently creates the 78–5 controversy. Plaintiffs contend that since the project finally approved by TRPA differs from the project pending on March 22, 1978, the exemption to 78–5 would not be applicable.

Normally in reviewing an administrative agency's decision, this Court's only function is to determine whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with the law, or unsupported by substantial evidence on the record taken as a whole. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Good Samaritan Hospital, Corvallis v. Mathews,* 609 F.2d 949 (9th Cir. 1979). Here the Court must be especially careful. The TRPA board which exempted the original Sahara project from Ordinance No. 78–5 is the same board which later found that the present project, although somewhat different, is for the purposes of the exemption, substantially the same as the original. This is important because the provision exempting applications received before 5:00 p. m. March 22, 1978, was silent with respect to the possible subsequent amendment of such applications. If the same board later interpreted that silence to mean that certain modifications will not defeat the exemption,

this Court should give substantial weight to that interpretation.

A reading of the transcript of the December 20, 1978, TRPA hearing on the Sahara project indicates that the board considered the relevant factors in finding that the project before it then was substantially the same project as that before it on March 22, 1978. (Transcripts of December 20, 1978, TRPA meeting, pages 177–307). The transcript reveals that a change in height of the project (from 93 ft. to below 40 ft.) was made in order to comply with the TRPA Land Use Ordinance. (TRPA Land Use Ordinance § 7.13) [14] An increase in size of the area to be occupied by the proposed structure resulted from the lower height limitation, and the change in its location was due to the final positioning of the loop road. (A proposed road intended to bypass the casino area at the south shore of Lake Tahoe.) Finally the increase in number of parking spaces in the structure was made to offset the loss of preexisting surface spaces, resulting from the larger area to be covered by the structure.

At the December 20, 1978, hearing, the TRPA board was concerned that the proposal before it would result in a net increase of 490 additional parking spaces over that which would have been available from the original project. Believing that it was dealing with a potentially exempted application, the board modified the application to conform in parking space numbers to the original plan for the project. The modification required Sahara to remove 458 existing surface spaces and replant that area with vegetation. As finally approved by a dual majority, the project called for a total of 2,400 parking spaces, as compared to 2,374 originally proposed.

█ On the basis of the foregoing, the Court concludes that it was not a clear error of judgment for the TRPA board to find the present Sahara project exempt from Ordinance No. 78–5. What agency should be better able to judge whether a

14. Pursuant to TRPA Land Use Ordinance § 7.13, no buildings may be constructed in a Tourist Commercial use district with a height greater than 40 feet, unless certain conditions supporting a height "variance" are met.

construction project is exempt from one of TRPA's ordinances than the TRPA?

Because the Court finds TRPA's de novo review valid, and because, as discussed hereinafter, the Court finds no collateral reasons to invalidate TRPA's actions, the actions of Douglas County need not be reviewed in this regard. When, as here, TRPA acts by dual majority rather than by default, it immunizes the actions of the lower body despite possible infirmities in that action originally. See *California Tahoe Regional Planning Agcy. v. Jennings*, 594 F.2d 181 (9th Cir. 1979).

Therefore, summary judgment in favor of defendants is proper with respect to plaintiff's First and Third Claims in 79-9, and Second Claim in 79-156.

## THE ISSUE RELATING TO SECTION 8.33

Plaintiffs' Second and Fourth Claims for relief in 79-9 and Third Claim in 79-156 allege violations of TRPA's Land Use Ordinance section 8.33 on the part of TRPA and Douglas County. The ordinance allows a permit-issuing authority to grant a permit "only if it is found" that the use for which a permit is sought will not be injurious to persons, property or the environment in the neighborhood of the planned use.[15] Plaintiffs claim that neither Douglas County nor TRPA made the required findings with respect to the Sahara parking garage complex.

In reviewing the findings of TRPA and Douglas County, it is not the function of the Court to weigh the considerable amount of conflicting evidence received by the administrative bodies. Because a dual majority of the TRPA board made the 8.33 findings on its de novo review, if the Court concludes that there was substantial evidence [15A] for TRPA's findings, it will not be required to reach the question of whether Douglas County made such findings. See supra. We must therefore proceed to examine the question of whether there was in fact a substantial basis to support TRPA's findings.

Although California presented to the TRPA board impressive evidence supporting the position that the Sahara project will not meet the requirements of Section 8.33, the board also received a great deal of evidence tending to show that the project is environmentally sound.

A study prepared and submitted to the TRPA board by Summit Engineering Corporation concluded that the Sahara project would actually benefit the environment. According to the study, the parking structure will diminish congestion within the surface parking area, thereby reducing both energy consumption and auto emissions. Due to the reduction in paved surface area that would result after the project is completed, the report concludes that there will be a significant reduction of snow storage and a reduction in stormwater run-off. In addition, the report suggests that the patrons of Sahara will benefit by the greater security provided them and their vehicles. The report denies that there is any conclusive evidence to support the fear that the parking structure might be growth inducing.

Martin Stern, Jr., AIA Architect and Associates also provided the board with an environmental information report concerning the project. Besides covering the factors considered by Summit, Stern mentioned the aesthetic qualities of the project. This report claims that the scenic qualities of the area will be enhanced by converting acres of paved parking space into landscaped open space.

A traffic impact analysis prepared and presented at the same time by De Leuw, Cather Consulting Services concluded that the structure, absent an increase in the gaming area at Sahara Tahoe would not be a traffic generator. Rather the firm concluded that the construction of the parking

---

**15.** See note No. 5 for relevant text.

**15A.** and that the Court review standards are met as set forth in *Citizens to Preserve Overton Park v. Volpe*, supra, and *Good Samaritan Hospital, Corvallis v. Mathews*, supra.

structure would benefit the environment because (1) the existing parking facilities are inadequate to serve existing demand, and (2) the relative use of U.S. 50 will decrease and use of the West Loop Road increase, consistent with the goals that resulted in the construction of the Loop Road.

The TRPA board also had before it statements from Sierra Pacific Power Company, Douglas County Sewer Improvement District, the Lake Tahoe Fire Protection District and the State of Nevada Department of Highways, all stating that with respect to their areas of interest the Sahara project did not present any major obstacles.

■ On this record, the Court concludes that the TRPA board had substantial evidence to support its 8.33 findings.[15B] Therefore, it finds summary judgment in favor of defendants is proper with respect to plaintiffs' claim that TRPA did not make legitimate 8.33 findings. Finding such, the Court need not determine whether Douglas County acted correctly, and summary judgment should be entered in favor of defendants on this issue also. See *California Tahoe Regional Planning Agency v. Jennings*, 594 F.2d 181 (9th Cir. 1979); at fn. 10.

## THE ISSUE RELATING TO THE POLITICAL REFORM ACT OF CALIFORNIA

Plaintiffs' Ninth Claim for relief in 79–9 alleges that one or more TRPA members were in violation of the California Political Reform Act (Act) at the time the project was approved. See Calif.Gov.Code § 87100. If applicable to TRPA, this Act would allow the Court to enjoin an official act of TRPA upon a preliminary showing that one of its governing members used his position on the TRPA board to influence a decision in which he had a financial interest.[16]

California urges that Article III(k) of the Tahoe Regional Planning Compact (Compact) makes the Political Reform Act applicable to TRPA. Article III(k) states that, "Each state may provide by law for the

disclosure or elimination of conflicts of interest on the part of members of the governing body appointed from that state."

The Compact is not explicit as to the means the states might use to insure that their representatives on the board have no pecuniary interest in TRPA decisions. However, the wording of the Compact and subsequent actions taken by Nevada indicate that the drafters of the Compact did not anticipate that one state would have the authority to unilaterally void action taken by members of both states.

When one thinks of a state providing "by law for the . . . elimination of conflicts of interest on the part of members . . . of that state," one envisions state legislation respecting individual members from that state. This was apparently Nevada's interpretation of the Compact. Nevada's conflict of interest statute, NRS 277.210, is directed toward penalizing individual members, rather than voiding actions of the body as a whole. The statute mandates a fine or imprisonment for Nevada TRPA members who have a financial interest in the decisions the TRPA makes.

Also noteworthy are Nevada's 1979 amendments to the Compact which (although not approved in such form by California or Congress and therefore not effective as a matter of law) are indicative of Nevada's original legislative intent. The writers of the amendments replaced Article III(k) with words strikingly similar to much of Article 1 and 2 of the California Political Reform Act. See 1979 Statutes of Nevada 1139. Conspicuous in its absence in the amended Nevada statute is any section similar to section 91003 of the California Act, which allows a court to void official acts of the TRPA board if its members had a financial interest in an official decision. This would appear to be a rather strong indication of Nevada's understanding of the contested portion of the Compact.

---

**15B.** The Court also finds that TRPA action was not arbitrary, capricious, an abuse of discretion, or not in accordance with the law.

**16.** See note No. 9 for relevant text.

Nevada's amendments to the Compact, Nevada's present conflict of interest statute, and the very wording of Article III(k) of the Compact (which speaks only to the disclosure or elimination of conflicts of interest, not the voiding of official acts) lead the Court to conclude that the authors of the Compact did not intend Article III(k) to give either state the power to unilaterally invalidate a TRPA action. Therefore the Court finds that Article III(k) does not make California's Political Reform Act applicable to TRPA.

The only remaining question with respect to this issue is whether California may, without authorization of the Compact or approval of Nevada, pass legislation that affects the inner workings of the interstate agency. The general consensus is that it may not. The United States Supreme Court in *Dyer v. Sims*, 341 U.S. 22, 28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951), states:

"It requires no elaborate argument to reject the suggestion that an agreement solemnly entered into between States by those who alone have political authority to speak for a State can be unilaterally nullified, or given final meaning by an organ of one of the contracting States."

See also: *C. T. Hellmuth v. Washington Metro Area Trans.*, 414 F.Supp. 408, 410 (D.Md.1976); *Rao v. Port of New York Authority*, 122 F.Supp. 595 (E.D.N.Y.1954); *Delaware River & B. Auth. v. New Jersey*, 112 N.J.Super. 160, 270 A.2d 704 (1970); *Brown v. Bowles*, 254 Md. 377, 254 A.2d 696 (1969).

Therefore the Court concludes that the California Political Reform Act does not provide a basis to invalidate the actions of TRPA in its approval of the Sahara project, and consequently the Court will not, on that basis, invalidate TRPA's approval.

## THE ISSUE RELATING TO DUE PROCESS

Plaintiffs' Tenth Claim for relief in 79–9 alleges that plaintiffs were denied a fair hearing on the Sahara project and were thereby deprived of due process of law. This is based upon the allegation that one or more TRPA members received gifts or other income from Sahara prior to voting on the Sahara parking garage project.

An impartial decision maker is a basic constituent of minimum due process. *Simard v. Board of Educ.*, 473 F.2d 988 (2nd Cir. 1973). The Supreme Court has made it clear that if the decision maker has a "substantial pecuniary interest" in the proceedings, he should not adjudicate the dispute. *Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973). Further, the pecuniary interest need not be direct. *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972).

Plaintiffs, however, do not allege that any TRPA member had a pecuniary interest in the outcome of the proceedings. Plaintiffs seem to be contending that since some members had received gifts from Sahara, they were favorably disposed to vote in defendant's favor.

It is uncontroverted for purposes of considering summary judgment that the only gift or income claimed to have been received by members of the TRPA board was a Cadillac automobile won by TRPA board member James Henry in a golfing contest sponsored by Sahara and campaign contributions from Sahara Tahoe and Sahara Reno received by Members Tom Stewart and Jean Stoess, respectively.

The Cadillac in question was awarded to Mr. Henry as a "closest-to-the-pin" prize in the Ninth Del Webb Sahara Tahoe Amateur Golf Classic. Out of the 354 contestants in the tournament, Mr. Henry came closest to a hole-in-one. There are no allegations of impropriety in the manner in which the tournament was organized or the manner in which Mr. Henry came to win the Cadillac. Although some contestants were invited to participate in the tournament compliments of Sahara, Mr. Henry paid the full entry fee of $500.00.

Further, an examination of the transcript from the December 20, 1978 TRPA meeting indicates no bias on the part of Mr. Henry in favor of Sahara. Initially, Mr. Henry voted in opposition to the Sahara project.

However, when he realized that a dual majority could not be raised to defeat it, and that the project would be "deemed approved" under the 60-day rule,[17] Henry changed his vote in order to place TRPA conditions on the project.

The uncontroverted facts before the Court with respect to Mr. Henry, indicate no bias in favor of Sahara. Left then is the question of whether the campaign contributions received by Mr. Stewart and Ms. Stoess created sufficient bias so as to deny plaintiffs their due process rights.

The record is scanty with regard to the campaign contributions. Sahara in its supplemental points and authorities deny that it was even given (although on page 275 of the transcripts of the December 20, 1978 TRPA hearing, provided by Sahara, both Stewart and Stoess admit to receiving them). For purposes of considering summary judgment we must assume that two members of the board did indeed receive campaign contributions from Sahara. However, neither facts nor allegations concerning the amount of the contribution, the nearness in time of the contributions to the TRPA vote on the Sahara project, Sahara's campaign contribution activities in general, or any underlying agreement, which might be indicative of the presence or absence of bias, is before the Court. In addition, there is nothing to indicate whether Stewart and Stoess received other contributions that might have negated any potential bias originating from the Sahara contributions.

On the basis of facts which simply show that campaign contributions were made (and nothing more), bias on the part of Stewart and Stoess may not be inferred. Plaintiffs have raised no other factual questions concerning potential bias on the part of the two members.

Therefore, the Court concludes that summary judgment in favor of defendants on the issue of due process is proper.

17. TRPA's Land Use Ordinance § 4.32 provides: "Administrative permits and variance permits required pursuant to Section 4.10(2) and issued by the permit issuing authority shall be subject to Agency review, and upon review of any such permit the Agency shall take final

## THE CLAIM RELATING TO NEPA

In their Eleventh Claim for relief in 79–9, plaintiffs assert that TRPA is an agency which must comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq. Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) requires "all *agencies of the Federal Government*" to "include in every recommendation or report on proposals for legislation and other major *Federal actions* significantly affecting the quality of the human environment" an environmental impact report (EIR) detailing the adverse environmental effects and alternatives to the proposed project. [emphasis added] No such EIR was obtained for Sahara's project.

California contends that the Law of the Union Doctrine "imbues TRPA with federal agency status". They contend that as TRPA administers federal law, *League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 507 F.2d 517 (1974), and as the agency derives its authority from Congress, it must be a federal agency.

■ Although California's argument may be logically plausible, the better case authority holds that TRPA is not subject to NEPA. *The People of the State of California v. The City of South Lake Tahoe*, 466 F.Supp. 527 (E.D.Cal.1978). *California Tahoe Regional Planning Agcy. v. N.S.C., Inc.*, No. CIV–R–78–0180–ECR (D.Nev., March 15, 1979).

In *Jacobson v. Tahoe Regional Planning Agcy.*, 566 F.2d 1353 (9th Cir. 1977), rev'd on other grounds sub nom. *Lake County Estates, Inc. v. Tahoe Planning Agcy.*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) the Ninth Circuit stated that "the approval of the Compact by Congress and the limited appointment power of the President did not thereby establish the TRPA as

action, whether to approve, to require modification or to reject such permit within 60 days after such permit is delivered to the Agency. If the Agency does not take final action with 60 days, the permit shall be deemed approved."

an agency of the United States." 566 F.2d 1353, 1362 (1977). On appeal, the United States Supreme Court in *Lake County Estates*, did not specifically address the Court of Appeals findings. However, the Court did hold that TRPA acts under color of state law for purposes of 42 U.S.C. § 1983. The Court reasoned that the Compact:

"... had its genesis in the actions of the compacting States, and it remains part of the statutory law of both States. The actual implementation of TRPA, after federal approval was obtained, depended upon the appointment of governing members and executives by the two States and their subdivisions and upon mandatory financing secured, by the terms of the Compact, from the counties. In discharging their duties as officials of TRPA, the state and county appointees necessarily have also served the interests of the political units that appointed them. The federal involvement, by contrast, is limited under the Compact to the appointment of one nonvoting member to the governing board. While congressional consent to the original compact was required, the States may confer additional powers and duties on TRPA without further congressional action. And each State retains the absolute right to withdraw from the Compact." 440 U.S. 391, 399, 99 S.Ct. 1171, 1176, 59 L.Ed.2d 401 (1979).

The same reasoning that the Supreme Court used in finding state action is supportive of defendants' contention that TRPA is not a federal agency. The Court finds this reasoning far more persuasive than plaintiffs' Law of the Union argument that seemingly ignores the realities of the situation. Therefore, the Court rejects plaintiffs' claim that TRPA is a federal agency within the meaning of NEPA.

Plaintiffs also contend that the "nexus between TRPA and the federal government renders TRPA's approval of the Sahara Tahoe project major federal action." Plaintiffs contend that as TRPA receives federal funding, and as the Compact creating it required Congressional consent, a sufficient "nexus" exists to create major federal action.

For authority, California cites *Homeowners Emergency Life Protection Committee v. Lynn*, 541 F.2d 814 (9th Cir. 1976) and *Dalsis v. Hills*, 424 F.Supp. 784 (W.D.N.Y. 1976). In both cases, the plaintiff in the action brought suit against the Secretary of the Department of Housing and Urban Development to enjoin the construction of a project, in which the federal agency had taken a major role. In the case presently before the Court, not only has the federal government not taken a major role in the Sahara project, it is doubtful that it even knew it existed until California named Douglas Castle, Administrator of the EPA, as a defendant.

■ The federal government provides funds to many state and local governments and agencies. That alone does not make all their actions federal actions. Merely providing funds is not enough. A major federal involvement in the project the plaintiffs seek to enjoin is required before an EIR is required by NEPA. Thus the Court rejects plaintiffs' contention that the nexus between TRPA and the federal government renders TRPA's approval of the Sahara project major federal action for the purposes of 42 U.S.C. § 4332, and finds that TRPA is not subject to the provisions of NEPA.

## THE ISSUE RELATING TO CEQA

Plaintiffs allege in their twelfth claim for relief that TRPA is a political subdivision of the State of California and as such is an agency which is required to comply with the provisions of the California Environmental Quality Act (CEQA). Cal.Pub.Res.Code §§ 21000–21176. Compliance with CEQA would require TRPA to prepare an environmental impact report detailing the significant environmental effects, mitigation measures and alternatives to the project. Cal.Pub.Res.Code § 21100. Further, TRPA would be required to mitigate or avoid any significant effects on the environment which the EIR discloses, if it is feasible to do so. Cal.Pub.Res.Code § 21002.1.

■ There is no authority for plaintiffs' position. Judge Claiborne in *California Tahoe Regional Planning Agency v. N.S.C., Inc.,* CIV–R–78–0180–ECR (D.Nev., March 14, 1979) held that CEQA was not applicable to TRPA because the Compact does not give California the right to impose the requirements of CEQA on TRPA, and Nevada has yet to consent to such imposition.

Judge Peckham in *The People of the State of California v. City of South Lake Tahoe,* 466 F.Supp. 527 (E.D.Cal.1978) held that CEQA could be applied to the actions of TRPA with respect to projects in California. He concluded that California had the right to impose CEQA provisions on TRPA projects under the authority of Article VI(a) of the Compact, which provides in relevant part:

"Every such ordinance, rule or regulation [adopted by TRPA to effectuate its regional plan] shall establish a *minimum* standard applicable throughout the basin, and *any political subdivision may adopt and enforce an equal or higher standard* applicable to the same subject or regulation *in its territory.*" (emphasis added)

Article VI(a) is explicit in only giving authority to subdivisions to adopt more stringent standards in their own territories.

Plaintiffs, nevertheless, propose three separate arguments as to why TRPA should be subject to CEQA: (1) the California legislature intended CEQA to have extraterritorial effect; (2) CEQA and the Tahoe Regional Compact are supplementary statutes which should be harmonized if possible; and (3) CEQA is an open meeting statute within the meaning of Article III(d) of the Compact.

Beginning with California's argument that it was the intent of the California legislature to have CEQA apply to TRPA, it should be noted that there is nothing in the Compact that authorizes California to unilaterally affect the inner workings of TRPA with respect to projects in Nevada. Article VI(a) of the Compact only authorizes political subdivisions to adopt more stringent environmental standards than those of the TRPA with respect to areas within the subdivision.

California's desire that CEQA have extraterritorial effect, without more, will not subject TRPA to the requirements of CEQA. One party to a compact may not "impose burdens upon the compact absent the concurrence of the other signatories." *C. T. Hellmuth v. Washington Metro. Area Tran.,* 414 F.Supp. 408, 409 (D.Md.1976). See also *Dyer v. Sims,* 341 U.S. 22, 28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951); *Rao v. Port of New York Auth.,* 122 F.Supp. 595 (E.D.N.Y.1954); *Delaware River & B. Auth. v. New Jersey,* 112 N.J.Super. 160, 270 A.2d 704 (1970); *Brown v. Bowles,* 254 Md. 377, 254 A.2d 696 (1969).

CEQA would certainly impose a burden on the Compact. It would require TRPA, the agency created by the Compact, to take action or possibly abstain from taking action for reasons not present in the Compact and never agreed to by the parties. Therefore, until Nevada agrees that CEQA is applicable to projects undertaken in the Nevada portion of the Basin (unlikely in the near future), California's mere desire that it have extraterritorial effect will not give CEQA such effect.

For the same reasons as stated above, the Court finds little merit in California's contention that CEQA and the Compact are in "pari materia" and therefore should be harmonized if possible (i.e., TRPA should be subject to CEQA). Essentially what California is arguing is that all California need do is pass a law with similar goals to one previously passed by Nevada (i.e., the Compact) in order to subject Nevada construction projects to California's law. The Court doubts Nevada legislators would have even dreamed of accepting the Compact if such a possibility existed.

California's final contention is that CEQA is an open meeting statute within the meaning of Article III(d) of the Compact. Article III(d) refers to the openness of the monthly meetings of the TRPA board. The purpose of such a provision is to insure that all members of the public who desire to are able to attend any meeting of the Agency.

The open meeting statutes referred to in the Compact are those statutes designated as such by the respective states (Cal.Gov. Code § 54950, et seq., and NRS § 241.020). The statutes require notice of the time, place, location and agenda. They also require minutes of each meeting to be kept and to include the substance of all matters proposed, discussed or decided.

It appears to the Court that California is attempting to bootstrap into the Compact the EIR provisions of CEQA, along with any notice provisions that may be stretched to apply to Article III(d) of the Compact. CEQA's notice provisions were enacted solely for the purpose of protecting California's environment. Although a laudatory goal, this surely was not the purpose envisioned by the authors of the Compact when writing Article III(d).

Seeing no merit in any of the arguments for subjecting TRPA to CEQA, the Court finds Summary Judgment in favor of defendants proper on this issue.

## THE ISSUE RELATING TO PROSPECTIVE NUISANCE

In their Thirteenth claim for relief in 79–9, plaintiffs allege that the Sahara parking garage project constitutes a prospective nuisance. Controlling on this issue is a case factually indistinguishable from the present one, *California Tahoe Regional Planning Agency v. Jennings*, 594 F.2d 181 (9th Cir. 1979).

In *Jennings*, Cal-TRPA and the State of California alleged that the Jennings', Kahle's, and Harvey's Hotel and Casino projects, if constructed, would result in an interstate nuisance. Circuit Judge Sneed, writing for the court, recognized that a federal common law action to enjoin a threatened nuisance might be valid. However, the standard he set forth for injunctive relief was quite strict; plaintiffs were required to establish that the danger of a nuisance be real and immediate. *California*

*Tahoe Regional Planning Agency v. Jennings*, 594 F.2d 181 (9th Cir. 1979). The Court of Appeals, quoting *Missouri v. Illinois*, 180 U.S. 208, 248, 21 S.Ct. 331, 346, 45 L.Ed. 497 (1900), stated, ". . . that if the evidence be conflicting and the injury be doubtful, that conflict and doubt will be ground for withholding an injunction."

In *Jennings*, California argued much the same as it does here, (i.e., the proposed construction will attract more people and cars to the Basin.) The Court of Appeals affirmed the dismissal of the claim, stating that the allegations of California were insufficient to establish that the danger of a nuisance was real and immediate.

The Court is bound by the holding in *Jennings*. The factual setting presently before the Court is not significantly different from that faced by the Court of Appeals in *Jennings*. The arguments made by California are essentially the same in both cases. And finally, the Court here is faced with conflicting evidence as to the environmental merits, just as was the Court in *Jennings*. Therefore, the Court finds Summary Judgment for defendants proper with respect to the prospective nuisance issue.

## THE ISSUE RELATING TO SAHARA'S FAILURE TO OBTAIN AN AIR REGISTRATION CERTIFICATE

Plaintiffs' Fifth Claim for relief in 79–9 and Fourth Claim in 79–156 assert that Douglas County and TRPA were in violation of Nevada's Air Quality Regulations in approving Sahara's project prior to the issuance of a valid Air Registration Certificate (ARC).[18] Defendants claim that neither TRPA nor Douglas County are in violation of Nevada's said Air Quality Regulations because neither has authority to issue such a registration certificate, or to require that one be issued prior to approval of the project.

In the Sixth Claim in 79–9 and Fifth Claim in 79–156, plaintiffs allege that the

---

18. Section 3.2.2 of the Nevada Air Quality Regulations requires that a valid registration certificate be obtained prior to the construction or alteration of any complex source. Section 13.-

1.3. prohibits the issuance of such a certificate if it is determined that the complex source will prevent the attainment and maintenance of the State and national air quality standards.

commencement of construction of Sahara's project without first obtaining such Registration Certificate as required by the Nevada SIP, as approved by the EPA, would be a violation of emission standards or limitations within the meaning of the Clean Air Act, and therefore should be enjoined.[19] Under § 7604(a)(1), any person may bring a civil action to enjoin the violation or prospective violation of an emission standard or limitation.

Defendants argue first that Nevada's SIP no longer requires an Air Registration Certificate for projects such as the proposed parking garage, and second, deny that such a requirement would be an emission limitation or standard for the purposes of a civil action under the Clean Air Act, § 7604(a)(1).

In December, 1963, in recognition of the fact that air pollution had become a national problem, and that federal financial assistance and leadership were essential to solve the problem, Congress approved the Clean Air Act (Public Law 88–206, 77 Stat. 392). The Act provided funds and a statutory framework for a national research and development for prevention and control of air pollution [Sec. 3.(a), 77 Stat. 394]. The Act provided grants for the support of state and local air pollution control programs; and finally, it enhanced and clarified the power of the Secretary of Health, Education and Welfare to deal with air pollution. 1963 U.S.Code Cong. and Admin.News, pp. 1260, 1262.

The Act, as passed and subsequently amended in 1967, (Public Law 90–148, 81 Stat. 485), proved inadequate to meet its goals. It was soon determined that programs pursued and methods employed in implementing the programs were too slow in developing and only minimally effective. 1970 U.S.Code Cong. and Admin.News, p. 5356. Congress thus undertook to "expand and intensify its war against air pollution", and passed the Clean Air Amendments of 1970. (Public Law 91–604, 84 Stat. 1676, et seq.)

Central among the features of the 1970 Amendments were the requirements that the Administrator of the Environmental Protection Agency establish minimum national ambient air quality standards, and the requirement that each state adopt and submit to the Administrator, "a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State." (Sec. 110(a)(1), Public Law 91–604, 84 Stat. 1680).

In January, 1972, shortly after the EPA, pursuant to the Amendments, established national ambient air quality standards, Nevada submitted its initial state implementation plan (SIP). The Administrator of the EPA approved the plan in part and disapproved it in part. Those portions of the plan concerned with CO and NO standards (the only portion of the plan concerned with pollution caused by automobiles) were approved and accepted by the EPA in May 1972. 40 CFR § 52.1472.

On February 25, 1974, the EPA promulgated a regulation pursuant to its interpretation of *Natural Resources Defense Council, Inc. v. EPA*, 475 F.2d 968 (D.C.Cir. 1973)[20] which in essence disapproved all state implementation plans (SIP) not containing indirect source review (ISR) regulations. 39 FR 7276, 40 CFR 52.22. Conse-

---

**19.** 42 U.S.C. § 7604(a) provides in pertinent part: "... any person may commence a civil action on his own behalf—(1) against any person ... who is alleged to be in violation of (A) an emission standard or limitation ..."

42 U.S.C. § 7604(f) defines the term "emission standard or limitation" as among other things, "... any condition or requirement under an applicable implementation plan relating to transportation control measures ..."
Plaintiffs contend that Nevada's complex source regulations are "transportation control measures" within the meaning of § 7604(f) and are therefore "emission standards or limitations" within the meaning of § 7604(f).

**20.** The Court of Appeals in *National Resources Defense Council, Inc. v. EPA*, requires the Administrator of the EPA to review all SIPs to see that they meet the requirements of § 110(a)(2)(A) through (H) of the Clean Air Act. [42 U.S.C. § 7410(a)(2)(A)–(H)]. If any state's SIP failed to comply with the Clean Air Act, the Administrator was mandated to promulgate regulations setting forth a SIP for that state which did meet the Act's requirements.

quently on April 1, November 12 and December 11, 1974, Nevada submitted to the EPA amendments to its SIP which included ISR regulations; these regulations were in turn approved by the EPA on March 26, 1975. (40 FR 13306).

The ISR regulations, which are the heart of this controversy, are embodied in Sections 1.39, 3.22 and 13.1–13.5 [21] of the Nevada Air Quality Regulations (NAQR). In essence, they make the obtaining of a valid Air Registration Certificate (a certificate certifying that a proposed structure will not prevent the attainment of national ambient air quality standards, NAQR 1.151, 13.1.3) a prerequisite to the construction of any complex source of air contaminants. A complex source is a structure (e.g., a parking garage) that, while not producing pollution itself, solicits activity that does emit contaminants. NAQR 1.39.

A tremendous controversy arose over the EPA's regulation, (40 C.F.R. § 52.22), requiring indirect source review. The federally mandated ISRs amounted to a significant federal intrusion into a traditionally local domain. Only eight states (Nevada among them) voluntarily submitted ISR amendments. The balance apparently appealed to their local Congressmen. Congress responded by restricting funding for EPA's administration of § 52.22 Pub.L.93–245, 87 Stat. 1071 (1974), forcing the EPA to suspend indefinitely its requirement of indirect source review regulation.

Congress and EPA's action left Nevada and other states, which had voluntarily submitted amendments to their SIPs adding ISR requirements, in a rather peculiar position. The amendments were approved by the Administrator of the EPA (52 C.F.R. 1472), and as such were incorporated into the body of federal regulations. *Appalachian Power Co. v. Environmental Protection Agency*, 477 F.2d 495 (4th Cir. 1973). As of that time, Nevada could only delete its ISR regulations if it could demonstrate to the Administrator that the implementation plan, absent the ISR, still provided for the attainment of the national primary ambient air quality standard. 42 U.S.C. § 1857c–5(a)(3) (1976), recodified as: 42 U.S.C. § 7410(a)(3)(A). States which had never amended their SIPs were not caught in this trap, and did not have to get permission to not enforce their ISR requirements.

Congress addressed this problem in the Clean Air Act Amendments of 1977 (P.L. 95–95, 91 Stat. 685). The amendments put strict limits on the Administrator's authority over indirect source review (ISR) regulations, and gave express permission to the States to delete ISR regulations from their implementation plans (SIP), "provided that such plan meet the requirements of this section." 42 U.S.C. § 7410(a)(5)(A)(iii).

The EPA originally interpreted § 7410(a)(5)(A)(iii) to mean that a state need only comply with the procedural requirements of the Clean Air Acts (CAA) when deleting its ISR regulations. However, following the mandate of *Manchester Environmental Coalition v. E.P.A.*, 612 F.2d 56 (2nd Cir. 1979), the EPA adopted the policy that the amended SIP must meet the substantive as well as procedural requirements of the Clean Air Act. The Court in *Manchester* denied that such interpretation was unfair to states such as Nevada, stating:

"it may well be that harsh inequities would result, not if ISR states cannot peremptorily delete these programs, but if other states must watch while an ISR state, the success of whose implementation effort depends on its ISR, abandons its pollution control plan." *Manchester Environmental Coalition v. E.P.A.*, 612 F.2d 56, 60 (2nd Cir. 1979).

---

**21.** See note No. 18 for pertinent text of Section 3.2.2 and 13.1.3. Section 1.3.9 defines a complex source as: any property or facility that has or solicits secondary or adjunctive activity which emits or may emit any air contaminant for which there is an ambient air quality standard, notwithstanding that such property or facility may not itself possess the capability of emitting such air contaminants. Section 13.2.2 requires that those seeking to modify an existing parking area so as to increase parking capacities by 500 motor vehicles or more must apply for a registration certificate.

On September 10, 1975, and again on May 18, 1977, Nevada submitted Nevada Revised Statute 445.493 to the EPA as ‚a SIP amendment.[22] The proposed Amendment forbade any Nevada agency from enforcing ISR regulations. Pursuant to NRS 445.493, Nevada has not enforced the ISR provisions of the Nevada SIP, approved by the EPA on March 26, 1975. Defendants contend that 42 U.S.C. § 7410(a)(5)(A)(iii) authorizes a state to make such a unilateral revision.

However, both the Court in *Manchester*, 612 F.2d 55, 60 and the Ninth Circuit Court of Appeals in *League to Save Lake Tahoe, Inc. v. Trounday*, 598 F.2d 1164 (9th Cir. 1979) and *Natural Resources Def. Coun. v. U. S. Envir. Pro. Agcy.*, 507 F.2d 905 (9th Cir. 1974) have rejected defendants' contention. The Court in *Trounday* in fn. 2, stated "until Nevada's unilateral suspension of its indirect source review provisions is approved by EPA, we must consider effective the complex source regulations incorporated in the plan."

At the present time, five years after Nevada attempted to eliminate ISR regulations from its SIP, the EPA has yet to approve or disapprove the revisions. The agency is apparently still in the consideration process, but there are indications that it may in time finally give its approval. Until such time as it does, however, Nevada's original SIP (inclusive of ISR regulations) remains a federal regulation and binding upon Nevada and its citizens.

Defendants contend that even if the ISR regulations in the Nevada Air Quality Regulations are federal regulations plaintiffs may not enjoin their action under the Clean Air Act, because the ISR regulations do not constitute "emission standards or limita-

tions" for the purposes of citizens' suits under § 7604. 42 U.S.C. § 7604(f)(3). The Ninth Circuit Court of Appeals in *League to Save Lake Tahoe, Inc. v. Trounday* has held otherwise.

The Court in *Trounday* held that indirect source review programs are properly included within the meaning of the term "transportation control measures". 598 F.2d 1164, 1170. Transportation control measures are specifically included in the definition of "emission standard or limitation" for the purposes of citizen suits under § 7604. [42 U.S.C. § 7604(f)(3)] Therefore, a suit to enjoin a violation of an ISR regulation within a currently approved state implementation plan would be proper under § 7604.

Section 3.22 NAQR included in the Nevada SIP requires that an Air Registration Certificate be obtained before construction begins on a complex source, but does not require any agency to refrain from issuing permits until such certificate is obtained. Therefore, there is no merit in the claim that Douglas County and TRPA were in violation of the regulation when they issued a permit for the Sahara project.

Defendants do not contradict plaintiffs' allegations that defendant Sahara has not obtained an Air Registration Certificate as required by the provisions of Nevada's SIP now in force. There is currently no Nevada state apparatus for issuing such a certificate.

The Court sympathizes with the unfair position in which defendant Sahara has been placed. Federal regulation required that it obtain an Air Registration Certificate before building the parking garage,

---

**22.** NRS 445.493 was submitted in total as an amendment to Nevada's SIP. It states that:

1. No regulation ... may be enforced as to indirect sources if it is more stringent with respect to the size cutoffs established for designated areas pursuant to the United States Clean Air Act of 1963 and the rules and regulations adopted in furtherance thereof.

2. Except as provided in subsection 3, if the United States Environmental Protection Agency delays the effective date for enforce-

ment of its indirect source regulations beyond January 17, 1977, the authority of a state agency or district board of health to review new indirect sources shall expire . . . .

3. If the federal indirect source becomes effective after January 17, 1977, then:

(a) The authority of a state agency to review new indirect sources may be exercised only:

(1) In the enforcement of the federal indirect source regulations; and

(2) To the extent enforcement by the state agency is required by the federal act.

but Nevada State law bars any state agency from issuing such a certificate. NRS 445.493. If the EPA had not dragged its feet for the last five years, Nevada's suspension of its ISR may well have been approved by now. If Nevada's proposed revision of its SIP had been rejected, the Nevada legislature might have reinstated the machinery necessary to review new complex sources.[22A] However, because the EPA has neither approved nor rejected the new SIP, Sahara is left with the need to obtain a registration certificate, but no place to go to obtain it.

 Nevertheless, the Court is compelled by the law to rule in favor of plaintiffs as to their motion for a preliminary injunction. Until such time as Sahara obtains a valid Air Registration Certificate, or until such time as one is no longer required,[23] Sahara must be enjoined from constructing their parking garage.

Although the Court recognizes that this is an appropriate case for such injunctive relief, it is going to retain under advisement the motions for summary judgment based on the failure of Sahara to obtain an Air Registration Certificate. This is because the Administrator of the Environmental Protection Agency has a nondiscretionary duty to make a decision regarding Nevada's proposed revision of its SIP. See *Kennecott Copper Corp., Nevada Mines v. Costle*, 572 F.2d 1349 (9th Cir. 1978). Further, the Administrator may be sued, in this Court, for an order requiring him to perform his duty. 42 U.S.C. § 7604(a). Fairness seems to require the Court to refrain from deciding said motions until an additional reasonable time has been allowed, subsequent to the change in EPA policy following *Manchester*, for the Administrator to act or for proceedings to be initiated to force him to act.

The State of California did attempt to join the Administrator as a party to this action, but he was dismissed by stipulation of his attorney and the California legal representatives. As yet, however, none of the defendants have sought to invoke the jurisdiction of this Court to require the Administrator to make a decision regarding the proposed revision.

A partial summary judgment, preliminary injunction and order shall be prepared in accordance with the foregoing.

---

**22A.** New legislative enactment to reinstate statutory machinery for obtaining an ARC might be a solution. Conceivably a request could then be made to withdraw the present pending proposed amendment to Nevada's SIP.

**23.** If the EPA should finally approve Nevada's revision to its SIP, an Air Registration Certificate would no longer be required, and Sahara would be permitted to proceed with construction of its parking structure.