EASTERN PARALYZED VETERANS ASSOCIATION, INC., PLAINTIFF, v. CITY OF CAMDEN, MELVIN R. PRIMAS, AS MAYOR OF THE CITY OF CAMDEN, DELAWARE RIVER PORT AUTHORITY, AND PORT AUTHORITY TRANSIT CORPORATION, DEFENDANTS.

CITY OF CAMDEN, DEFENDANT THIRD PARTY PLAINTIFF, v. JOHN P. RENNA, COMMISSIONER OF THE STATE OF NEW JERSEY, DEPARTMENT OF COMMUNITY AFFAIRS, THIRD PARTY DEFENDANT.

Superior Court of New Jersey
Chancery Division Camden County

Decided March 21, 1986.

574

*James D. Fornari,* a member of the Bar of New York, admitted pro hac vice, (*Hannoch Weisman,* attorneys for plaintiff).

*Dennis G. Kille,* for Defendant and Third Party Plaintiff, City of Camden (*Patricia A. Darden,* City Attorney).

*John J. Chernoski* for Third Party Defendant, John P. Renna, Commissioner of the State of New Jersey, Department of Community Affairs (*W. Cary Edwards,* Attorney General of New Jersey).

*Hersh Kozlov* for Defendants, Delaware River Port Authority and Port Authority Transit Corporation (*Kozlov, Seaton & Romanini,* attorneys).

LOWENGRUB, J.S.C.

Plaintiff, Eastern Paralyzed Veterans Association, Inc., seeks judgment compelling the City of Camden (Camden), the Delaware River Port Authority (DRPA) and the Port Authority Transportation Corporation (PATCO) to install an elevator in

the Camden Transportation Center (CTC) to accommodate users of the CTC between the main floor of the building and the train platform of the Broadway PATCO station located within that structure. It is alleged by plaintiff that the State Uniform Construction Code Act (U.C.C.A.), *N.J.S.A.* 52:27D–119 *et seq.,* the State Standard Barrier–Free Design Code, *N.J.A.C.* 17:19A–1.1 *et seq.,* and the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 *et seq.,* mandate the installation of an elevator.

Camden filed a third party complaint against the Commissioner of the Department of Community Affairs alleging that the Bureau of Construction Code Enforcement (Bureau) within the Department refused to issue building permits or a certificate of occupancy for the portion of the CTC serviced by the PATCO train platform unless an elevator was included in the CTC plans and installed as provided in the regulations promulgated pursuant to the Barrier–Free Design Code. The Commissioner filed a counterclaim against Camden and cross-claims against DRPA and PATCO seeking to enforce the U.C.C.A.

This matter is now before the court on cross motions for summary judgment. A motion for summary judgment was filed on behalf of DRPA and PATCO seeking a determination that the U.C.C.A. and the Barrier–Free Design Code could not be applied because the DRPA is a bi-state agency not subject to the laws of either New Jersey or Pennsylvania. Motions for summary judgment have also been filed on behalf of the Commissioner and plaintiff seeking enforcement of the U.C.C. A. and the Barrier–Free Design Code. There are no material facts in dispute and the issues may be decided without a plenary hearing. *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 73–75 (1954).

On June 8, 1984, Camden and DRPA entered into a contract which, among other things, provided for the construction of the CTC. DRPA was to convey certain designated lands to the Housing Authority of Camden. Those lands were to become part of the redevelopment area for the CTC and were referred

to in the agreement as "Property Rights." The agreement further provided that Camden was to become owner of a portion of the "Property Rights", and the owner of a "transportation center on the east side of Broadway and/or a participant in future developments on or in the other Property Rights being conveyed to the Housing Authority". DRPA's existing passenger transit facilities on the east and west sides of Broadway were to be demolished and replaced by the new facilities.

The sections of the agreement relevant to the issue of the installation of the elevators are as follows:

1.4 With respect to any construction, maintenance, repairs, alterations, and/or work of any kind or type of which the CITY is the owner, sponsor, participant in title, and/or a participant in any way, and which is to be performed in the PROPERTY RIGHTS, or touching the PROPERTY RIGHTS, it will be the CITY's obligation to prepare or cause to be prepared and submitted, complete sets of the plans and specifications and any changes therein to the Chief Executive Officer of DRPA, which term shall include the Chief Executive Officer of any successor in interest in DRPA (hereinafter CEO of the DRPA) in advance of any such construction work.

1.4.1 The decision of the CEO of the DRPA regarding said plans shall be final and determinative and shall be based on the protection and safety of the public and maintenance of uninterrupted service and continuity of operation of DRPA's RTS.

1.4.2 Any construction, maintenance, repair, or work of any type within any of the PROPERTY RIGHTS shall be done, or caused to be done, by the CITY at such time and in such manner as shall be satisfactory to the CEO of the DRPA.

1.4.3 Any construction, maintenance, repair, or other work of any type in the PROPERTY RIGHTS shall be at CITY's sole cost and expense or at the sole cost and expense of its agent, designee or successor or assign in title, and with no cost or expense to DRPA and/or PATCO.

1.4.4 The manner of construction and materials used shall be such as are customarily used in projects involving construction over railroad and/or rapid transit right-of-way.

1.4.5 The approval of the DRPA shall in no way pass on the sufficiency, adequacy or validity of such construction or construction procedures for any purpose, and shall not relieve the CITY or its successor of any liability or responsibility relative thereto.

The agreement does not specifically provide for an elevator and DRPA refuses to permit the installation of one in the CTC; hence, this suit.

The Legislature has mandated that "all plans and specifications for the construction or remodeling of any public building in the State shall provide facilities for the physically handicapped." *N.J.S.A.* 52:32–4. "Public building" is defined as, among other things, a public transportation terminal and station. *N.J.S.A.* 52:32–6(a). It is clear the CTC is, by definition, a public building.

In order to implement *N.J.S.A.* 52:32–4, the State Standard Barrier–Free Design Code, *N.J.A.C.* 17:19A–1.1 *et seq.,* was adopted.[1] This was done in accordance with *N.J.S.A.* 52:32–5 providing that the Department of Community Affairs shall promulgate regulations as to the kinds, types and quality of the facilities for the physically handicapped and in accordance with the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 *et seq.* The Barrier–Free Design Code applies to the construction of all buildings, structures, and facilities used by the general public. Although exceptions are provided, no exception is applicable to the facts in this case. *N.J.A.C.* 17:19A–1.2(a)(1)–(6).

The U.C.C.A. was enacted, among other reasons, to provide standards for construction, to adequately protect the health, safety, and welfare of users of buildings and to eliminate unnecessary duplication of effort and fees in the review of construction plans and the inspection of construction. *N.J.S.A.* 52:27D–120(a), (c), (e) & (f). Under *N.J.S.A.* 52:27D–129(b)

Construction, alteration, renovation, rehabilitation, repair, removal or demolition of any building or structure situated wholly within New Jersey by or for an agency created by an interstate compact to which the State of New Jersey is a party shall be subject to the provisions of the code; provided that such interstate agency shall have exclusive authority to administer and enforce the code in regard to such buildings and structures.

---

[1]The State Standard Barrier–Free Design Code, *N.J.A.C.* 17:19A–1.1 *et seq.,* was to expire on February 1, 1984. However, *P.L.*1981, *c.* 35, § 8 provides:

Any regulations concerning facilities for the handicapped adopted prior to the effective date of this amendatory and supplementary act by the Department of the Treasury pursuant to P.L.1971, c. 269 shall remain in effect until revised or amended by the Commissioner of the Department of Community Affairs.

The following relevant definitions are provided in *N.J.S.A.* 52:27D–121:

"Building" means a structure enclosed with exterior walls or fire walls, built, erected and framed of component structural parts, designed for the housing, shelter, enclosure and support of individuals, animals or property of any kind. "Structure" means a combination of materials to form a construction for occupancy, use, or ornamentation whether installed on, above, or below the surface of a parcel of land; provided, the word "structure" shall be construed when used herein as though followed by the words "or part or parts thereof and all equipment therein" unless the context clearly requires a different meaning.

In compliance with *N.J.S.A.* 52:27D–123, the Commissioner of the Department of Community Affairs adopted regulations for the U.C.C.A. *N.J.A.C.* 5:23–1.1 *et seq.* The U.C.C.A. provides for enforcement of its provisions by the municipal construction official, the sub-code officials or the interstate compact to which the State of New Jersey is a party. *N.J.S.A.* 52:27D–121 & 129(b).

Consistent with the definitional provisions of the U.C.C.A., the purpose and use of the CTC and the legislative mandate that the U.C.C.A. apply to the construction of all buildings to be erected in this State, it is clear the plan for the CTC must be reviewed and approved before a building permit is issued. *N.J.S.A.* 52:27D–130. The Camden Transportation Center is a building or structure for purposes of the U.C.C.A. It is a public facility built and owned by Camden. As a station and terminal, it is a place of public accommodation within the meaning of the New Jersey Law Against Discrimination. *N.J.S.A.* 10:5–5(*l*).

The U.C.C.A. requires facilities for the physically handicapped be provided in accordance with the Barrier–Free Design Code. *N.J.A.C.* 17:19A–1.1. Barrier-free means an environment that will permit a handicapped person to operate independently with comparative ease under normal circumstances and with little or no other assistance. *N.J.A.C.* 17:19A–2.1. The barrier-free design regulations require elevators be provided in every multi-storied building, with certain exceptions

not relevant here. *N.J.A.C.* 17:19A–5.6(a). Defendants DRPA and PATCO contend the CTC is not governed by the U.C.C.A. or the Barrier–Free Design Code because DRPA is a bi-state agency not subject to the unilateral application of the laws of a single state signatory to the compact.

The ultimate issue for decision is:

Does the U.C.C.A., as implemented by the Barrier–Free Design Code, compel the DRPA to include an elevator as an integral component of the CTC to accommodate members of the general public between the main floor of the terminal and the train platform?

Bi-state agencies exist by virtue of compacts between states, entered into by their legislatures with the approval of Congress. *Del. Riv. & Bay Auth. v. N.J. Pub. Emp. Rel. Com.,* 112 *N.J.Super.* 160, 165 (App.Div.1970), aff'd o.b., 58 *N.J.* 388 (1971). Once established, the agency is a single agency of the governments of both states. Its primary purpose is to cooperate in advancing the mutual interests of the citizens of both states by joint action to overcome· common problems. *Ibid.* However, one state to an interstate compact may not enact legislation which imposes burdens upon the agency absent all other signatories' consent. *Kansas City Area Transportation Authority v. State of Missouri,* 640 *F.*2d 173, 174 (8th Cir. 1981). *See also Bell v. Bell,* 83 *N.J.* 417, 424 (1980).

Defendants DRPA and PATCO cite *Cal. Tahoe Regional Planning v. Sahara Tahoe Corp.,* 504 *F.Supp.* 753 (D.Nev. 1981), as precedent for their contention that New Jersey may not impose its law, the U.C.C.A., unilaterally upon the bi-state agency. *Cal. Tahoe* involved the proposed construction of a six-level parking garage by defendant Sahara Tahoe Corp. on the south shore of Lake Tahoe in Nevada. *Id.* at 754. Plaintiffs, the State of California and the California Tahoe Regional Planning Agency (Cal–TRPA), sought to enjoin the proposed construction. *Ibid.* The Tahoe Regional Planning Compact was created as an interstate compact between Nevada and California to adopt and enforce a regional plan of resource conservation and orderly development in the Lake Tahoe basin.

Id. at 755. California was attempting to halt development by the Nevada gaming industry in the basin. *Ibid.*

The plaintiff's twelfth claim for relief in *Cal. Tahoe* alleged defendant Tahoe Regional Planning Agency (TRPA), created by the compact, was a political subdivision of the State of California and an agency governed by California Environmental Quality Act (CEQA). *Id.* at 763. Compliance with CEQA would require TRPA to prepare an environmental report detailing significant environmental effects, mitigation measures and alternatives to the project and would additionally require TRPA to mitigate or avoid any significant environmental effects the report disclosed if feasible to do so. *Ibid.* The court held there was no authority for plaintiff's position in that CEQA was not applicable to the TRPA. The compact did not give California the right to impose the requirements of CEQA on TRPA and Nevada had yet to consent to such imposition. *Cal. Tahoe* at 764.

Insofar as the twelfth count is concerned, *Cal. Tahoe* is inapposite to the present case. California sought to impose its laws upon a structure being constructed in the State of Nevada. Plaintiff here seeks to impose the laws of New Jersey upon a structure constructed in the State of New Jersey.

However, the allegation in the ninth claim for relief in *Cal. Tahoe* is relevant to the present case. In that count, plaintiffs claimed one or more members of TRPA were in violation of the California Political Reform Act. If the Act applied to TRPA, the court could enjoin an official act of TRPA upon a preliminary showing that one of its governing members used his position on the TRPA board to influence a decision in which he had a financial interest. *Id.* at 760. Upon addressing the issue of "whether California may, without authorization of the compact or approval of Nevada, pass legislation that affects the inner-workings of the interstate agency," the *Cal. Tahoe* court stated "[t]he general consensus is that it may not." *Id.* at 761.

The *Cal. Tahoe* court thus focused upon the question similarly raised in this case. Namely, whether New Jersey, without

authorization of the compact or approval of Pennsylvania, may enforce legislation affecting the internal workings of DRPA. First to be decided is whether the installation of the elevator affects the internal or external workings of the DRPA. It is clear that one signatory to a compact may not compel compliance with its laws as they affect the internal workings of an interstate agency. But, if the legislation affects the external workings of the agency, application of the legislation is proper.

In *Agesen v. Catherwood*, 26 *N.Y.*2d 521, 311 *N.Y.S.*2d 886, 260 *N.E.*2d 525 (1970), petitioners, direct employees of the Port of New York Authority engaged in building and mechanical trades, sought to apply New York's prevailing rate of wage legislation to their employment. The compact between the States of New York and New Jersey did not expressly empower the Authority to fix salaries, but the court found the power to be implied. *Agesen* at 524, 311 *N.Y.S.*2d at 887–88, 260 *N.E.*2d at 526. The court held the inapplicability of the New York law providing for a higher wage scale resulted not from any express exclusion or inherent unworkability but rather from a general intent reflected in the compact that the *internal* operation of the Authority be independent of the direct control of either State acting without the concurrence of the other. *Ibid.*

The *Agesen* court concluded:

The distinction between the internal operations and conduct affecting external relations of the Authority is crucial in charting the areas permitting unilateral and requiring bilateral State action. New York and New Jersey have each undoubted power to regulate the external conduct of the Authority, and it may hardly be gainsaid that the Authority, albeit bistate is subject to New York's laws involving health and safety, insofar as its activities may externally affect the public use ...

Indeed, given sufficient social or economic justification, the lines of external and internal operation may shift, justifying increased regulation as the impact outside the Authority becomes more pronounced. Finally, even as to internal matters, the two States, by bilateral action, may always regulate Authority action, when unilateral action is ineffective or impractical.

*Id.* at 525, 311 *N.Y.S.*2d at 888, 260 *N.E.*2d at 526–27.

Defendants rely on *Del. Riv. & Bay Auth. v. N.J. Pub. Emp. Rel. Com.*, *supra*, as authority to compel this court to deny the relief plaintiff seeks. I find that case is not controlling.

In *Del. Riv. & Bay Auth.*, the issue was whether the New Jersey Public Employment Relations Commission (PERC) had jurisdiction over the Delaware River & Bay Authority, a bistate agency created by compact between the States of New Jersey and Delaware. *Id.* 112 *N.J.Super.* at 162. The court there stated:

We fail to see how either state could enact laws involving and regulating the bi-state agency unless both states agree thereto. To sanction such practice would lead to discord and a destruction of the purposes for which such bi-state agencies are formed. As previously indicated, the New Jersey Employer–Employee Relations Act, of which PERC is an integral part, was enacted to enable public employees to organize and to engage in collective negotiations with their public employers. However, New Jersey's policy in this regard cannot be foisted upon Delaware and its citizens who are employed by plaintiff.

*Del. Riv. & Bay Auth.* at 165–66.

The determination of the court in *Del. Riv. & Bay Auth.* is consistent with the determination of the court in *Agesen.* In both cases, one state unilaterally sought to apply its laws to all employees of a bi-state compact. Such an application would interfere with the inner workings of bi-state agencies. The case at bar is significantly distinguishable. Installation of an elevator satisfies the requirements of the U.C.C.A. and the Law Against Discrimination. No further interference with the DRPA is contemplated. No continuing regulation by the State of New Jersey is necessary as was with establishment of a wage rate for residents of New York in *Del. Riv. & Bay Auth.* or enforcement of the political reform act in *Cal. Tahoe.*

At issue in *Henderson v. Delaware River Joint Toll Bridge Commission*, 362 *Pa.* 475, 66 *A.2d* 843 (1949), *cert.* den., 388 *U.S.* 850, 70 *S.Ct.* 94, 94 *L.Ed.* 520 (1949), was whether an Act of Pennsylvania, eliminating the necessity of the interstate Commission's obtaining municipal consent to occupy or overpass streets of a municipality in constructing a Commission project, violated the compact between the State of New Jersey and the Commonwealth of Pennsylvania as to construction and control of bridges between the two states. The Borough of Morrisville, Pennsylvania, alleged the Act was void in that it

undertook to change the terms of the compact without the approval of New Jersey. The court, however, held that Pennsylvania had jurisdiction to further the Commission's authority so as to enable it, with respect to matters within the jurisdiction of Pennsylvania, to perform adequately and completely the purposes of the compact. *Henderson* at 487–88, 66 *A*.2d at 849. The *Henderson* court stated:

> It is within the competency of a State, which is a party to a compact with another State, to legislate in respect of matters covered by the compact so long as such legislative action is in approbation and not in reprobation of the compact. *See Olin v. Kitzmiller*, 259 *U.S.* 260, 263, 42 *S.Ct.* 510 [511], 66 *L.Ed.* 930 [1922], affirming the same case as reported in 9 Cir., 268 *F.* 348 [1920] ...

*Henderson* at 488, 66 *A*.2d at 849–50.

In the present case, the agreement between Camden and DRPA, § 1.4.5, *supra*, provides that DRPA shall not pass on the sufficiency, adequacy or validity of construction of the CTC. The U.C.C.A. grants authority to the interstate agency to enforce and administer the construction of the center in the State of New Jersey subject to the U.C.C.A. *N.J.S.A.* 52:27D-129(b), *supra*. The standards for construction provided in the U.C.C.A. are in approbation and not repudiation of the interstate compact.

Compliance with the U.C.C.A. and the Law Against Discrimination is a valid exercise of the sovereign power of the State of New Jersey to preserve the safety and general welfare of the public. Compliance with those enactments does not, in anywise, effect the innerworkings of the interstate agency. They provide for access to the CTC by the general public. The general public is not a homogenous unit; it includes the handicapped.[2] It consists of individuals who are sure footed, as well

---

[2]*N.J.S.A.* 52:32–6(b) provides:

> "physical handicap" means a physical impairment which confines a person to a wheelchair; causes a person to walk with difficulty or insecurity; affects the sight or hearing to the extent that a person functioning in public areas is insecure or exposed to danger; causes faulty coordination; or

as those who are lame, sight or hearing impaired, and those confined to a wheelchair. The DRPA is, therefore, required to provide the general public with access to the CTC in compliance with the U.C.C.A. and the Law Against Discrimination.

■ Insofar as the record is presently constituted, it appears that the Bureau of Construction Code Enforcement is responsible for the plan review of construction of the CTC. The project is a Class I project for purposes of U.C.C.A. enforcement. It is a mixed use of assembly and business; more than 8,400 square feet and over two stories in height. *N.J.A.C.* 5:23–3.10. Camden's enforcing agency is a Class II enforcing agency. As such, under *N.J.A.C.* 5:23–3.10, Camden is not permitted to conduct a plan review of a Class I project. Consistent with *N.J.A.C.* 5:23–3.11(a)(4), the Department of Community Affairs is the enforcing plan review agency where the local enforcing agency is not appropriately classified to perform that function. Therefore, the Department of Community Affairs is the enforcing agency in this case required to insure that the requirements of the U.C.C.A. and other applicable laws have been met. *N.J.S.A.* 52:27D–131(a). However, Camden's enforcing agency is still responsible for the issuance of all necessary construction permits and certificates of occupancy as well as all required inspections.

DRPA argues that it is the enforcing agency of the U.C.C.A. with regard to construction of the CTC by virtue of *N.J.S.A.* 52:27D–129(b), *supra* at 5. The operative language to be considered in determining the identity of the enforcing authority is the "by or for" language of the statute. It is clear the CTC is being built "by" Camden. The question is whether it is being built "for" DRPA. DRPA acknowledges the entirety of the structure is not being built for it, but asserts the vertical transportation facilities providing access to and from the

---

reduces mobility, flexibility, coordination and perceptiveness to the extent that facilities are needed to provide for the safety of that person.

streets, the parking garage and the train loading areas are being built for it.

The definitions of building and structure, as heretofore noted, speak of the whole and not parts of buildings or structures. The legislative intent of the U.C.C.A. compels this court to view the structure as a whole and not to focus on a fragment such as a vertical transportation element (commonly known as a staircase, elevator or escalator). The entirety of the CTC is not being built for DRPA. One portion of the CTC cannot be segmented from the whole to allow DRPA to have exclusive jurisdiction as the enforcing agency for that portion. A rule of statutory construction provides plain meaning be given to plain words. *Watt v. Borough of Franklin,* 21 *N.J.* 274, 277 (1956). That rule is applicable here. The legislative intent of the statute is determined by reading the entire legislative scheme. *New Jersey State Policemen's Benevolent Ass'n. Local 29 v. Irvington,* 80 *N.J.* 271, 282–83 (1979). The U.C.C.A. is geared toward uniformity of application. DRPA is to have supervision over a portion of the project and the Department of Community Affairs the balance. To relieve the DRPA from the mandate of the U.C.C.A. would be contra to the intent and purpose of the U.C.C.A. *See N.J.S.A.* 52:27D–120(a) through (f).[3] The CTC is being built "by and for" Camden and, therefore, the Department of Community Affairs is the enforcing agency.

The Handicapped Access Law, *N.J.S.A.* 52:32–4 *et seq* is also applicable to this case. It provides for the promulgation of regulations by the Department of Community Affairs prescribing the kinds, types and quality of facilities for the physically handicapped. *N.J.S.A.* 52:32–5. Consistent therewith, the Commissioner of the Department of Community Affairs has provided that facilities for the handicapped are to be constructed in accordance with the Department of Treasury's "barrier-

---

[3]Further evidence of the intent of the legislative scheme concerning facilities in public buildings, can be found in *N.J.S.A.* 52:32–4, 5 & 6.

free" design regulations. *N.J.A.C.* 17:19A–1.1 *et seq.* The purpose of the regulations is to make buildings used by the general public accessible to and functional for physically handicapped persons. *N.J.A.C.* 17:19A–1.1(a). Those regulations are intended to apply to the construction of all buildings used by the general public. An exception may be granted pursuant to *N.J.S.A.* 52:32–8 which provides:

> In cases of practical difficulty, the enforcing agency may grant exceptions from the specific requirements of the standards and specifications required by this act or permit the use of other methods or materials, but only when it is clearly evident that equivalent facilitation and protection for the physically handicapped are thereby secured.

The predicate of "practical difficulty" must be interpreted before the exception provisions of the statute are applicable. DRPA does not assert the elevator shaft and the elevator cannot be located within the CTC because of building design, materials to be used or composition of the underlying ground. DRPA alleges the practical difficulty concerns the interaction of rail cars and termini. In order to permit the physically handicapped, particularly those who are wheelchair bound, to use the CTC, DRPA and PATCO allege they would have to redesign certain elements of the railroad cars to lessen the space between the car and the terminal platform to allow wheelchairs to traverse that space. This would allegedly cause undue expense to make the facility accessible to a small percentage of the public. DRPA and PATCO contend additionally, the location of an elevator in the CTC would be of little benefit to the handicapped because there are no other elevator facilities in any other stations along the PATCO high speed line. This would compel people to use stairways or escalators to go from a train platform to the main floor of the other stations.

To accept either argument would forever bar disabled members of the public from using the main transportation rail facility presently carrying passengers between Lindenwold, New Jersey, and Philadelphia, Pennsylvania. The assertion that rail cars may have to be redesigned to permit wheelchairs to go from the platform to the car considers only one segment

of the handicapped population. It does not give consideration to persons who can walk with the use of a cane, crutches, or walker; people who can, with some difficulty, climb stairs or use an escalator, but would be aided by the use of an elevator. However, persons confined to wheelchairs also should be able to use the rail line if they so choose. They are members of the public and must not be discriminated against.

DRPA further argues that since no other station has an elevator, there is no reason to install an elevator in the CTC. Such reasoning would forever bar the installation of an elevator in every station, present or future, along the PATCO line. It would forever bar progress and forever deprive the handicapped from safely using a transportation facility designed for the entire public. The elevator is not a futuristic device. It is a mechanical device used daily in residences, commerce and industry. Precluding the installation of an elevator in the CTC builds obsolescence into a modern structure.

The argument of DRPA and PATCO that physically handicapped persons may use substituted transportation facilities, provided in New Jersey by the New Jersey Department of Transportation and in Philadelphia by Southeastern Pennsylvania Transportation Authority, is not sufficient to bar the installation of the elevator in the CTC. Equivalent facilitation is a factual issue to be determined at a plenary hearing. However, I have concluded, predicated on the authority of the U.C.C.A. and the Barrier–Free Design Code, judgment be entered in favor of plaintiff to compel amendment of the plans for the construction of the CTC to include the installation of an elevator for the use of the general public between the main floor of the CTC and the train platform of the PATCO rail line system. Therefore, reference to equivalent facilitation need not be addressed.

Plaintiff's counsel shall submit a form of judgment consistent with the views expressed herein, in accordance with *R.* 4:42–1(b).